Filed 8/17/23  In re P.H. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re P.H., a Person Coming Under the Juvenile Court Law. | D082051 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. A.M., Defendant and Appellant. | (Super. Ct. No. NJ15729) |

APPEAL from an order of the Superior Court of San Diego County, Nadia Keilani, Judge.  Affirmed.

Tracy M. De Soto, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel and Emily Harlan, Deputy County Counsel, for Plaintiff and Respondent.

In this dependency case, A.M. (Mother) appeals from a juvenile court order denying her petition under Welfare and Institutions Code[1] section 388 for modification of prior court orders placing her two-year-old son P.H. with his maternal grandmother, terminating Mother's reunification services, and scheduling a section 366.26 hearing to select a permanent plan for the child. We conclude that the juvenile court committed no error by finding that Mother failed to make a prima facie showing that (1) there were substantially changed circumstances, or (2) her requested modification was in P.H.'s best interests. Accordingly, we affirm the juvenile court's order.

FACTUAL AND PROCEDURAL BACKGROUND[2]

A.  *Initial Dependency Petition*

Mother gave birth to P.H. in December 2020, when Mother was 19 years old and J.H. (Father) was 21 years old. During her pregnancy, Mother used marijuana and cocaine. P.H. tested positive for marijuana at birth.

In January 2021, when P.H. was one month old, Father went to Mother's home and punched her in the "face and head 10 times" during an argument while she was holding P.H. Weeks later, Mother and P.H. moved in with Father where he continued to be verbally and physically abusive towards Mother. In one incident, Father threw a phone at Mother while she was holding P.H. and shoved her in P.H.'s presence, and on another occasion, Father used Mother's own hand to hit her and "make it look like" Mother had hurt herself. Mother was reluctant to seek a temporary restraining order (TRO) against Father, so P.H.'s maternal grandmother completed and filed

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

[2]  Our summary of the facts and procedural history is limited to provide context relevant to the single issue presented in this appeal.

one for Mother. The court subsequently issued a criminal protective order (CPO), then modified it to be effective until April 2026. The CPO generally restrained Father from having any contact with Mother and P.H. or coming within 100 yards of them.

In March 2021, the San Diego County Health and Human Services Agency (Agency) filed a section 300, subdivision (a) dependency petition for three-month-old P.H., alleging he faced a substantial risk of serious physical harm due to the domestic violence incidents between his parents in his presence. At the jurisdiction hearing in April, the court found true the allegations in the petition and declared P.H. a dependent. After finding no detriment to placing P.H. with Mother, the court restored P.H.'s custody to Mother and ordered family maintenance services for her. P.H. resided with Mother at his maternal grandmother's home.

B. *The Family Maintenance Period*

The family maintenance case plan required Mother and Father to "participate in services recommended by the Agency" and create a safe environment for P.H. Initially, Mother actively engaged in family maintenance services, but beginning in June 2021, she began missing her domestic violence groups and parenting classes. Around the same time, she started going out, returning home late, drinking, and using drugs.

In early July, Mother was arrested for driving under the influence (DUI), resulting in her driver's license being suspended. Weeks later, Mother got into an argument with the maternal grandmother, left home, and took P.H. with her to the paternal grandmother's house where Father lived. Eventually, Mother returned to the maternal grandmother's home.

In August 2021, Father broke into the maternal grandmother's home because he was upset that Mother had used his debit card. The maternal

3

grandmother's roommate was home at the time. During an argument, Father "hit" Mother and took her phone. The maternal grandmother called the police. When law enforcement arrived, Mother denied any physical altercation or injury. Mother later called the sheriff's department to drop all the charges against Father. She ultimately reconsidered and decided to press charges after she saw how the incident "deeply affected" the roommate.

Between July and August, Mother communicated regularly with Father, despite the CPO and their history of domestic violence. On her birthday in late August, Mother used cocaine and alcohol and was so intoxicated that she was taken to the hospital. Around this period, Mother spent "substantially" less time with P.H., staying out all night and sleeping in late. She was arrested for another DUI, but bailed herself out and continued to drive on a suspended license.

At a special hearing in late September 2021, the juvenile court ordered Mother not to "possess or imbibe any alcohol or non-prescription drugs" and to "follow the no contact order regarding father." From September to October, Mother continued to consume alcohol and possibly drugs, frequently stayed out overnight, and drove with a suspended license. She also spent time with various men at motels and a park and spent very little time caring for P.H. The maternal grandmother had to step in to care for P.H., and Mother repeatedly rebuffed her requests for help.

C. *P.H.'s Section 388 Petition*

In late October 2021, P.H.'s counsel filed a section 388 petition, asking the court to remove P.H. from Mother's custody and place P.H. in the maternal grandmother's custody with Mother out of the home. The petition asserted a modification order was appropriate because Mother left P.H.

4

without care for "extended periods of time," had not enrolled in substance abuse treatment, and was becoming "erratic and unstable."

Days later, Mother began smoking marijuana in P.H.'s presence. She continued to stay out overnight, often with a male friend or the paternal uncle. Mother subsequently moved out of maternal grandmother's home and began staying with friends.

At a hearing in November 2021, the juvenile court scheduled a contested modification hearing for a later date at Mother's request. In the meantime, the court ordered Mother to vacate the maternal grandmother's home, authorized P.H. to remain on an extended stay with the maternal grandmother, and allowed liberal supervised visits for Mother.

The criminal court attached a Secure Continuous Remote Alcohol Monitor (SCRAM) device to Mother's ankle to monitor her alcohol intake. Despite this, she continued to drink alcohol. She was admitted into an intensive outpatient program for substance abuse treatment, but was discharged after she was arrested and briefly taken into custody. The program gave her another chance to start services after she was released, but she chose not to participate. Mother completed a parenting class at the end of November. In December, she was admitted to the hospital for "mental health concerns."

At the contested modification hearing in December, the Agency supported P.H.'s section 388 petition. The court found that Mother had not "fulfilled her responsibilities as a day[-]to[-]day caretaker" of P.H. since he was placed in her custody at the disposition hearing eight months earlier. The court further found that Mother had "violated the Court's conditions" by, among other things, driving under the influence on a suspended license, being involved in another domestic violent incident, and getting hospitalized

5

due to "alcoholic issues." Considering "the spiralling [*sic*] and escalating nature of . . . [M]other's circumstances," the court concluded that P.H. was "at risk." It thus granted the minor's section 388 petition, ordered P.H. removed from Mother's physical custody and placed with the maternal grandmother, and converted the family maintenance case plan to a reunification plan. The Agency social worker assigned to the case later explained to Mother the seriousness of going from family maintenance to reunification.

D. *The Reunification Period*

In December 2021, Mother, appearing to be under the "influence of something," barged into the maternal grandmother's home unannounced to get her mail and use the restroom. Mother exhibited "odd behavior" and was "aggressive in front of [P.H.]." The maternal grandmother was "scared" and "said she was going to call the police."

The following month, Mother missed many sessions of domestic violence and substance abuse services. She was eventually terminated from both programs. The substance abuse program discharged Mother because she refused to participate in a higher level of care and lacked stable housing.

Mother's supervised visits with P.H. were mostly positive but inconsistent. Between December 2021 and January 2022, Mother continued to maintain contact with Father and sometimes visited his family's home.

At a special hearing in January 2022, the court ordered a neuropsychological evaluation be added to the case plan following a doctor's recommendation.

In April 2022, Mother enrolled in an inpatient drug treatment program but left after just three days. At the child and family team meeting, the social worker expressed concern Mother had yet to start or complete any services on her case plan. Mother acknowledged the concern and said she

6

would try to complete them. In May, Mother declined the Agency's request for a drug test. During the reporting period, Mother's communication with the social worker was "very inconsistent."

About five months after the court ordered Mother to do so, she completed her psychological evaluation in June 2022. During the evaluation, Mother denied "any shortcomings and faults, even those minor and common ones encountered by most adults." She claimed to experience no psychological issues and "embraced a self-favorable presentation." She lamented that "the Agency and her mother continue[d] to try and control her actions and [were] not necessary for her to adequately parent her child and self-sustain." The psychologist concluded that "she is not prepared to or adequately able to provide for herself without the providence of those around her to ensure her basic needs are met (food, shelter, medical care), let alone be charged with the care, security, and custody of [P.H.]." The psychologist diagnosed Mother with alcohol, stimulant, and cannabis use disorders; antisocial personality traits; and unspecified depressive and anxiety disorders based on her history.

Mother failed to attend the child and family team meetings in June and October 2022. She admitted she was still using marijuana and opiates. Mother also had three warrants for her arrest.

Based on Mother's lack of progress on her case plan and failure to start or complete substance abuse services or domestic violence education, and the Agency's belief that Mother was incapable of caring for P.H. and would pose a significant safety threat to him, the Agency recommended termination of Mother's reunification services and a section 366.26 hearing. Adopting the Agency's recommendation at the six-month review hearing in October 2022,

the court terminated Mother's reunification services and scheduled a section 366.26 hearing to terminate parental rights.

In its section 366.26 report, the Agency noted the maternal grandmother had expressed willingness to adopt P.H. It found the maternal grandmother had demonstrated an ability to provide for P.H.'s "physical, emotional and developmental needs," as she had been providing full-time care for P.H. since November 2021. The Agency thus recommended termination of parental rights and a permanent plan of adoption by the maternal grandmother.

E. *Mother's Section 388 Petition*

Before the section 366.26 hearing, Mother filed a section 388 petition in March 2023, requesting that she be given custody of P.H. with family maintenance services, or alternatively, that reunification services be reinstated. P.H. was then two years and three months old. Mother asserted that she had "participated and made progress in residential treatment to mitigate the risks preventing her from safely caring for [P.H.]," she was "participating in substance abuse treatment, group therapy, and domestic violence prevention treatment," she would be "transitioning to outpatient treatment and sober living on 3/6/23," and she had "maintained visitation with" P.H. The petition attached several letters and a quarterly progress report from the inpatient treatment program.

The letters showed that Mother had received five weeks of residential substance abuse and domestic violence treatment beginning in late January 2023. As of March 2, 2023, she had completed her "detox/residential treatment" and transitioned to a different program for outpatient treatment and sober living. Mother had "ultimately surrendered to the fact that she will continue to enhance her recovery in a structured environment where she

8

can remain accountable and continue to build her sober support network." One letter stated Mother was "working on processing trauma/issues that perpetuate her substance use disorder."

The progress report stated Mother had "made good progress with developing insight into the impact of the violence on herself and [her] child." Mother reported that she had begun using fentanyl after learning that her boyfriend had a child with someone else, but she had "maintained her sobriety since she began her treatment." A therapist noted that the mother's fentanyl use might account for her lethargic appearance in group sessions and her very low verbal participation. The therapist diagnosed Mother with opioid dependence in early remission and mild alcohol use in sustained remission. The therapist did not seem to be aware of Mother's recent alcohol abuse and two DUIs during the dependency proceedings, however, as Mother apparently only disclosed to the therapist that she had abused alcohol for two years as a teenager. The therapist recommended that Mother have individual therapy sessions "to prevent a relapse into a severe state of depression and/or decompensation" and "to process her childhood traumas in a more private setting."

At the prima facie hearing on March 23, 2023, P.H.'s and the Agency's attorneys opposed the section 388 petition. After hearing arguments, the court first noted that "once reunification services are terminated the focus of the proceeding changes from family reunifications to child's best interest in permanence and stability." The court noted that Mother had not enrolled in the inpatient treatment program until nearly four months after the termination of reunification services, which the court found to be "a significant period of time" given P.H.'s young age. In particular, the court said, "while I do appreciate [M]other's renewed effort to attempt to remedy

9

the circumstances that resulted in [P.H.] being taken out of her care, the court finds that what mother is alleging is merely that circumstances are *changing* and *not* that they have, in fact, *changed*." (Italics added.) It further found "that it *would not* be in [P.H.]'s best interest to delay these proceedings further because his best interest is very clearly in finding permanence and stability in his life." (Italics added.) The court thus summarily denied the petition.

Mother appealed.

## DISCUSSION

Mother argues that the juvenile court abused its discretion by summarily denying her section 388 petition because she established a prima facie case for relief. We disagree.

A.    *Applicable Principles*

"Section 388 provides an ' "escape mechanism" ' for parents facing termination of their parental rights by allowing the juvenile court to consider a legitimate change in the parent's circumstances after reunification services have been terminated. [Citation.]" (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) Section 388 permits the parent of a dependent child to petition the juvenile court for a hearing to modify a prior order (1) "upon grounds of change of circumstance or new evidence" and (2) if "the best interests of the child . . . may be promoted by the proposed change of order." (§ 388, subd. (a)(1), (d); see Cal. Rules of Court, rule 5.570(a).)

Before an evidentiary hearing is required, the petitioning parent must first make a prima facie showing that these two elements are supported by "probable cause." (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157 (*G.B.*); *In re Marilyn H.* (1993) 5 Cal.4th 295, 310 (*Marilyn H.*).) "While the petition must be liberally construed in favor of its sufficiency [citation], the allegations

10

must nonetheless describe specifically how the petition will advance the child's best interests." (*G.B.*, at p. 1157.) If the allegations would fail to sustain a favorable decision even if they were accepted as true, the petition may be summarily denied without an evidentiary hearing. (*Ibid.*)

"In determining whether the petition makes the required showing, the court may consider the entire factual and procedural history of the case." (*In re K.L.* (2016) 248 Cal.App.4th 52, 62.) " 'Not every change in circumstance can justify modification of a prior order.' " (*In re N.F.* (2021) 68 Cal.App.5th 112, 120.) The petition "must show *changed*, not changing, circumstances" (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 (*Mickel O.*)), and the changed circumstances "must be substantial" (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223). That is, there must be a showing that "the problem that initially brought the child within the dependency system [has been] removed or ameliorated." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

A section 388 petition is addressed to the sound discretion of the juvenile court and will not be disturbed on appeal absent a clear abuse of discretion. (*In re Daniel C.* (2006) 141 Cal.App.4th 1438, 1445.) The denial of a section 388 motion rarely merits reversal as an abuse of discretion. (*Ibid.*)

B.    *The Court Properly Denied Mother's Section 388 Petition*

Mother first contends that her circumstances had changed substantially because she had "undergone detoxification and residential substance abuse rehabilitation," remained sober, and gained "insight" into the impact of domestic violence. Although we commend Mother for her efforts in starting down the path of recovery, we nevertheless conclude that the trial court did not abuse its discretion by finding "changing" rather than "changed" circumstances.

11

In cases involving a history of substance abuse problems, courts have consistently declined to recognize *substantially changed* circumstances based on a relatively brief period of sobriety or engagement in another treatment program. (*Ernesto R., supra*, 230 Cal.App.4th at p. 223 [despite her completion of a drug treatment program, mother's recent sobriety merely reflected *changing* circumstances given her history of relapses]; *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [concluding "three months old" efforts at sobriety did not demonstrate changed circumstances]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [concluding seven months of sobriety were insufficient to show changed circumstances given long history of addiction].)

This case is no different. The juvenile court properly concluded that "what mother is alleging is merely that circumstances are *changing* and *not* that they have, in fact, *changed*." (Italics added.) Mother had a serious history of drug and alcohol abuse. She had received substance abuse treatment as a teenager three times—for six months at a time. She used cocaine and marijuana while pregnant with P.H.; she used cocaine, marijuana, and Percocet during the family maintenance period; she began using fentanyl and continued using it until she entered a treatment program in January 2023; and she abused alcohol and was arrested for DUI twice during the dependency proceedings.

Although Mother completed a five-week residential treatment program starting in January 2023, she was still transitioning to an outpatient program at the time of the March 2023 hearing on her section 388 petition. Several weeks had passed since her discharge from residential treatment, yet she did not provide the juvenile court with evidence that she was in fact participating in outpatient treatment or a sober living program. Mother herself acknowledged the need to "*continue to* enhance her recovery in a

12

structured environment where she can remain accountable and *continue to* build her sober support network." Moreover, her domestic violence therapist believed she still needed individual therapy in addition to group sessions "to prevent a relapse into a severe state of depression and/or decompensation" and "to process her childhood traumas in a more private setting." Given Mother's extensive history of drug and alcohol abuse, and her continuing need for further therapy and outpatient treatment, the juvenile court reasonably concluded that her recovery was still a work in progress, notwithstanding her completion of a five-week treatment program late in the dependency proceedings.

Because the juvenile court did not abuse its discretion by finding no substantial change of circumstances, it acted properly by denying Mother's section 388 petition. However, the juvenile court also ruled against Mother on the second requirement for relief under section 388 by finding that the proposed modification would not be in P.H.'s best interests based on the need for "permanence and stability in his life." We conclude that this finding was also not an abuse of discretion.

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point, 'the focus shifts to the needs of the child for permanency and stability.' " (*Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*); *Marilyn H., supra*, 5 Cal.4th at p. 309 ["The parent is given a reasonable period of time to reunify and, if unsuccessful, the child's interest in permanency and stability takes priority."].) "A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Stephanie M.*, at p. 317.)

13

Mother filed her section 388 petition nearly five months after reunification services had been terminated. By this point, P.H.'s need for permanency and stability was the juvenile court's primary concern. (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 317–318.) And it was Mother's burden to show how her proposed change would "advance the child's need for permanency and stability." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

The juvenile court properly concluded that Mother failed to make a prima facie showing that her proposed modification would advance P.H.'s need for permanency and stability. From birth, the only real stability P.H. has had in life is his maternal grandmother, who has cared for him for several years and is "committed to providing permanency, stability, and love through adoption." Although the Agency social worker noted "some strength in the parent-child relationship" between Mother and P.H., she also observed that Mother's "continued struggle with substance abuse, untreated mental health and personal issues have disrupted the development of a substantial parent-child relationship." Mother exposed P.H. to domestic violence, used drugs in his presence, failed to provide him with care and supervision, left him in the care of his maternal grandmother, and visited him inconsistently. Mother's continued sobriety after a five-week treatment program was anything but certain, and she provided no proof that she had found or could provide "a permanent and stable home" for P.H. (*In re I.B.* (2020) 53 Cal.App.5th 133, 163), given that she had moved out of the maternal grandmother's home and had been living with friends.

As the social worker concluded, the "benefits of adoption outweigh maintaining a relationship" between Mother and P.H., who "deserves the continued stability provided in his current placement." In these circumstances, the juvenile court reasonably found that Mother had failed to

14

establish a prima facie case that delaying the selection of a permanent plan of adoption by maternal grandmother was in P.H.'s best interests or served his need for permanency and stability. (See *Marilyn H., supra*, 5 Cal.4th at p. 310 ["Childhood does not wait for the parent to become adequate."]; *In re Mary G.* (2007) 151 Cal.App.4th 184, 206 [delaying the selection of a permanent plan to see if a parent "might be able to reunify at some future point[ ] does not promote stability for the child or the child's best interests."].)[3]

---

[3]     Mother relies on the factors set forth in *Kimberly F.* (1997) 56 Cal.App.4th 519, 530–532, to contend that the juvenile court erred in denying her modification petition. But the same court that decided *Kimberly F.* has since rejected application of these factors after the juvenile court has terminated reunification services and set a section 366.26 hearing for selection of a permanent plan. (*In re J.C., supra*, 226 Cal.App.4th at p. 527.) The *J.C.* court correctly concluded that the *Kimberly F.* factors "do not take into account the Supreme Court's analysis in *Stephanie M.*, applicable after reunification efforts have been terminated." (*Ibid.*) Even if we were to consider the *Kimberly F.* factors, however, we would reach the same result. The *Kimberly F.* factors are: "(1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that problem; (2) the strength of relative bonds between the dependent children to *both* parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been." (*Kimberly F., supra*, 56 Cal.App.4th at p. 532.) Overall, even assuming the truth of the facts alleged in Mother's section 388 petition, these factors do not weigh in her favor for the reasons we have discussed.

## DISPOSITION

The March 23, 2023 order denying Mother's section 388 petition is affirmed.

BUCHANAN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.

16